UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: _____

PAMLAB, L.L.C.,
a Louisiana limited liability company, and
BRECKENRIDGE PHARMACEUTICAL, INC.,
a Florida corporation,

      Plaintiffs,
v.

VIRTUS PHARMACEUTICALS, LLC,
a Florida limited liability company,

      Defendant.

## COMPLAINT

Pamlab, L.L.C., and Breckenridge Pharmaceutical, Inc. (collectively, "Plaintiffs"), by and through their attorneys, state as follows for their Complaint against Defendant:

### The Parties

1. Plaintiff Pamlab, L.L.C. ("Pamlab") is a Louisiana limited liability company, with its principal place of business at 4099 Highway 190, Covington, Louisiana, 70433.

2. Plaintiff Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Florida corporation, with its principal place of business at 1141 South Rogers Circle, Suite 3, Boca Raton, Florida, 33487.

3. Defendant Virtus Pharmaceuticals, LLC ("Virtus") is a Florida limited liability company with its principal place of business at 2640 Causeway Center Drive, Tampa, Florida, 33619.

4821-9479-8097.1

## Jurisdiction and Venue

4. This Court has original jurisdiction over the subject matter of this lawsuit under 28 U.S.C. §§ 1331 and 15 U.S.C. § 1121(a), because it concerns violations of section 43 of the Lanham Act, 15 U.S.C. § 1125; this Court has supplemental jurisdiction over the state law claims herein pursuant to 28 U.S.C. § 1367, because the subject matter is so related to the claims asserted under federal law as to form part of the same case or controversy.

5. This Court has personal jurisdiction over Virtus because it is a Florida limited liability company, and also because it markets and sells products to nationwide retail drug store chains, including those with locations within this judicial district, as well as through nationwide wholesalers and distributors, databases, and others that target this judicial district. Virtus has purposefully and voluntarily placed its products into the stream of commerce with the expectation that they will be purchased by consumers in this District, and with the result that they have in fact been purchased by consumers in this District.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## STATEMENT OF FACTS

### Plaintiff Pamlab And Its Medical Foods

7. Plaintiff Pamlab is a fully integrated pharmaceutical company, founded over 50 years ago, that is now the largest pharmaceutical company in Louisiana. Pamlab specializes in the development of prescription medical foods that are marketed and sold nationally.

8. Pamlab markets its medical foods as a "brand" pharmaceutical company. As such, Pamlab markets its products directly to physicians, educating physicians concerning the benefits and appropriate uses of its medical food products. Pamlab has spent millions of dollars calling on tens of thousands of physicians through Pamlab's sales force, providing millions of

product samples, publishing articles and advertisements in medical journals, and funding clinical studies.

9. "Medical foods" are to be used by patients only under the supervision of a physician or other licensed health professional. Pamlab's medical foods have been formulated to provide the B complex vitamin known as "folate," needed to meet the distinct nutritional requirements of patients with certain diseases and medical conditions that have been demonstrated to respond to such formulation, and are available by prescription only.

10. Among these products marketed by Pamlab are three that are relevant to this lawsuit (one of them in two separate strengths):

   a. Metanx®, an orally administered prescription medical food for the dietary management of endothelial dysfunction in patients with diabetic peripheral neuropathy;

   b. Cerefolin®, an orally administered prescription medical food for the dietary management of certain metabolic processes identified with early memory loss; and

   c. Deplin® 7.5 and 15, orally administered prescription medical foods for the dietary management of patients suffering from depression and suboptimal folate levels.

11. Previously, folate supplementation was usually provided via a synthetic form of folic acid (for example, in daily vitamins and dietary supplements). Such synthetic forms of folic acid must undergo several metabolic steps to be converted into their natural, active forms of folate before they can be used in the human body.

12. However, due to their unique formulation, Metanx®, Cerefolin®, and Deplin® 7.5 and 15 (collectively, the "Pamlab Products") contain the active, naturally occurring form of

folate used by the body: 6(S)-5-Methyltetrahydrofolate, also called L-Methylfolate. The presence of the dietary ingredient L-Methylfolate is used by Pamlab as a unique selling point for these products.

13.     The unique benefits of this compound come in part from the fact that L-Methylfolate consists of a single diastereoisomer. Many chemical compounds occur as mixtures of two or more diastereoisomers, which have the same chemical composition, but differ in the spatial arrangement of the atoms. The various diastereoisomers that are present in such mixtures may have very different properties from one another. In some cases, one diastereoisomer can have a therapeutic effect, while another diastereoisomer is therapeutically ineffective or even harmful. Thus, there are often great benefits to providing patients and consumers with a product that contains only a single diastereoisomer as opposed to a diastereoisomeric mixture.

14.     Diastereoisomers are distinguished from one another through naming conventions that reflect their different properties. One such naming convention uses an "L" in the name of the compound to indicate one diastereoisomer, and a "D" in the name of the compound for a different diastereoisomer. The L-form of this compound used in the Pamlab Products – *i.e.,* L-Methylfolate – is superior to the D-form of this compound (D-Methylfolate) because the L-form is the naturally occurring predominant form of folate found in food and the human body. The L-form is the biologically active form of folate and has proven to have a high degree of bioavailability (the rate at which a drug or other substance is available at the targeted place in the body) in humans. The D-form, on the other hand, is an unnatural form of folate of no benefit to humans.

15.     In sum, Pamlab's various brand Products are formulated for health care professionals to provide folate, an essential human vitamin of the B complex, in its natural,

active form, in amounts shown to be required to meet the distinct nutritional requirements of patients with specific diseases or conditions that have been demonstrated to benefit from such treatment. For comparison, the Recommended Dietary Allowance for healthy adults is 0.4 mg. folate per day (measured in "dietary folate equivalents"; this is equivalent to 0.20-0.24 mg. of folic acid); the Pamlab Products contain many multiples of the RDA: 3 mg. of L-Methylfolate calcium in Metanx®, 5 mg. in Cerefolin®, and 7.5 mg. and 15 mg. in Deplin® (equivalent to approximately 2.54 mg., 4.23 mg., 6.35 mg. and 12.69 mg. of folic acid, respectively).

### The Nature Of Generic Competition For The Pamlab Products And The Role Of The Pharmaceutical Industry Databases

16.     As is well known, pharmaceutical products are often available as a brand product and also as one or more "generic" versions that are required to contain the same active ingredients, dosage form, and strength as the brand product. The market for any particular pharmaceutical product typically begins with one established brand-name product, which is joined later by one or more lower-cost, generic alternatives.

17.     Because the Pamlab Products are dispensed by prescription, in order for a generic product to compete in this market, it must be "substitutable" for one of the Pamlab Products. For this type of pharmaceutical product, a generic may be substituted for a brand product (where permitted) if it is "pharmaceutically equivalent," which means that it must contain the same active ingredients, in the same strengths, and in the same dosage form, as the brand product.

18.     Before such substitution can occur, and thus before generic products can be marketed to pharmacies, it is necessary that the generic products be "linked" to the brand product in the industry databases such as First DataBank and Walters Kluwer (Medi-Span). Retail pharmacies, chains, and other purchasers of such products rely on this "linking" in the databases to establish that two different products are, in fact, pharmaceutically equivalent. Based on this

"linking," pharmacists at the local level will decide what generic product can be substituted when filling a prescription, and pharmacy purchasers at the national level will decide what generic products to stock for their retail chain nationwide.

19. Unlike drugs, whose equivalency ratings are determined by the FDA and referenced in the FDA publication, the "Orange Book," equivalency determinations for medical foods are based on the honor system whereby the databases rely primarily on product labeling provided by the generic pharmaceutical companies themselves. Generic medical foods are "linked" to branded products if their label claims are the same—notwithstanding the actual contents of the products. The listing databases do *not* perform any independent testing on products to confirm the label description of their ingredients. As such, this system depends on truthful reporting by the generic companies of the identity and amount of the active ingredients in their products. There is no Orange Book for medical foods.

## Plaintiff Breckenridge And The Authorized Generic Products

20. Plaintiff Breckenridge, in contrast to Pamlab, is a generic pharmaceutical company. For more than 25 years Breckenridge has been in the business of developing and marketing generic pharmaceutical products, and currently markets more than 70 such products by having them "linked" in the industry databases to the brand products for which they may be substituted.

21. Following the introduction of unauthorized generic competition to the Pamlab Products in 2010, Pamlab first arranged for authorized generic versions of some of these products to be marketed under the Zerxis Pharmaceuticals label. Pursuant to an agreement between Pamlab and Breckenridge, all generic versions that have been authorized by Pamlab (the "Authorized Generic Products") are now marketed by Breckenridge.

**Defendant Virtus And Its Sub-Potent Purported Generic Products**

22. Virtus is a new, small pharmaceutical company that was formed just over a year ago as a Florida limited liability company. According to information available on industry databases, Virtus rushed two dozen generic products to market in the first year of its existence.

23. Several of the Virtus products purport to be generic versions of the Pamlab Products. Specifically, Virtus markets its product "L-Methyl-B6-B12" as containing the same active ingredients in the same amount as Pamlab's Metanx®, Virtus markets its "L-Methylfolate MC" as containing the same active ingredients in the same amount as Pamlab's Cerefolin®, and Virtus markets its "L-Methylfolate Calcium" 7.5 and 15 as containing the same active ingredients in the same amounts as Pamlab's Deplin® 7.5 and 15 (collectively, the "Purported Generic Products").

24. The Parties to this lawsuit market the products shown in the table below. Plaintiffs market the Pamlab Products, and also market the identical products with different labels as the Authorized Generic Products. Virtus markets, as competing products, the Virtus Purported Generic Products.

25. A comparison of the labels of the Pamlab Brand Products with the labels of the Virtus Purported Generic Products show the same amounts of the identical active ingredients claimed by both. The amount of L-Methylfolate stated on their labels of each group of products is shown in the right-hand column:

|   | Pamlab Product Brand Name | Virtus "Purported Generic" | L-Methylfolate on Label |
|---|---|---|---|
| 1. | Metanx® | L-Methyl-B6-B12 | 3.0 mg. |
| 2. | Cerefolin® | L-Methylfolate MC | 5.0 mg. |
| 3. | Deplin® 7.5 | L-Methylfolate Calcium 7.5 | 7.5 mg. |
| 4. | Deplin® 15 | L-Methylfolate Calcium 15 | 15 mg. |

26. As noted, Virtus has labeled its Purported Generic Products as containing the same amounts of the identical active ingredients as the Pamlab Products. By submitting this labeling to the industry databases, through the process described above, Virtus has succeeded in having its four Purported Generic Products "linked" by the databases with the four Pamlab Products. Virtus has also represented directly to Plaintiffs' customers and potential customers that its products contain the claimed amounts of L-Methylfolate.

27. However, prior to filing this lawsuit, Plaintiffs obtained samples of the Virtus Products and arranged for an outside, independent laboratory to perform standard analytical testing on these products. The assay results showed the following amounts of L-Methylfolate contained in each product, as a percentage of the amount claimed on its labeling:

| Product | Percentage |
|---|---|
| L-Methyl-B6-B12 | 56% |
| L-Methylfolate MC | 44% |
| L-Methylfolate Calcium 7.5 | 55% |
| L-Methylfolate Calcium 15 | 51% |

28. Thus, none of the four Virtus Purported Generic Products contains anywhere close to the same amount of L-Methylfolate as its label claims or as the Pamlab Product to which it claims pharmaceutical equivalence. The Virtus version of these medical foods contain only about one-half of the represented amounts of folate, yet they are being substituted for prescriptions of the Pamlab Products.

29. By falsely representing the amount of active ingredients in these products, Virtus has caused physicians to treat certain conditions related to folate-deficiency with products that are themselves folate-deficient.

30. By virtue of its misrepresentations concerning the ingredients of its Purported Generic Products, and their substitutability for the Pamlab Products, Virtus has made and continues to make false or misleading representations of fact, that misrepresents the nature,

characteristic, or qualities of these products. As a result, Virtus has made, and will make, sales of its Purported Generic Products to parties that would otherwise have purchased the Pamlab Products or the Authorized Generic Products.

31. Upon information and belief, Virtus has also made other false and/or misleading representations of fact that misrepresent the nature, characteristic, or qualities of its Purported Generic Products, including, *inter alia*, misleading potential customers into believing that these products meet the definition of "covered" drugs and are fully reimbursable by all federal and state Medicaid programs, as well as private third-party programs, that have resulted in sales of these products to parties that would otherwise have purchased the Pamlab Products or the Authorized Generic Products.

## COUNT I
### Violation Of The Lanham Act

32. Plaintiffs incorporate the allegations of paragraphs 1 through 31 as though fully set forth herein.

33. Virtus's explicit and/or implicit representations that its Purported Generic Products contain the same amounts of the identical active ingredients as the Pamlab Products, and that they are generic equivalents of, substitutable for, and/or may be dispensed to fill prescriptions for the Pamlab Products, constitute false and/or misleading descriptions and representations of fact that misrepresent the nature, characteristics, and/or qualities of Virtus's Purported Generic Products, and otherwise constitute false advertising under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

34. Moreover, upon information and belief, because Virtus has not scientifically determined whether its Purported Generic Products are pharmaceutically equivalent to the Pamlab Products, the explicit or implied representations made by Virtus that these products are

generic equivalents of, substitutable for, and/or may be dispensed to fill prescriptions for the Pamlab Products constitute false advertising under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

35. Upon information and belief, Virtus has also made other false and/or misleading representations of fact that misrepresent the nature, characteristic, or qualities of its Purported Generic Products, that misrepresent the nature, characteristics, and/or qualities of Virtus's Purported Generic Products, and otherwise constitutes false advertising under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

36. Virtus's false and misleading explicit and/or implicit representations go to an inherent quality or characteristic of its Purported Generic Products.

37. Upon information and belief, Virtus's false and misleading explicit and/or implicit representations have been made in interstate commerce, are material, have influenced purchasing decisions in this District and elsewhere, and will continue to do so unless enjoined.

38. Plaintiffs have suffered and will continue to suffer actual damage, in an amount to be determined at trial.

39. Upon information and belief, Virtus will continue its violation of the Lanham Act unless this violation is restrained and enjoined by this Court. Due to Virtus's continuing acts of false advertising, Plaintiffs have suffered and/or will suffer irreparable injury for which they have no adequate remedy at law.

## COUNT II
**Violation Of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.***

40. Plaintiffs incorporate the allegations of paragraphs 1 through 37 as though fully set forth herein.

41. The acts of Virtus alleged above, including its false and/or misleading representations of fact concerning the nature, characteristic, and qualities of the Virtus Purported Generic Products, constitute unfair methods of competition, and unfair and deceptive trade practices, in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), *Fla. Stat.* § 501.201, *et seq.*

42. Upon information and belief, Virtus's false and misleading explicit and/or implicit representations are material and have influenced purchasing decisions in this District, and elsewhere and will continue to do so unless enjoined.

43. By reason of Virtus's unlawful actions, Plaintiffs have suffered and continue to suffer irreparable harm for which there is no adequate remedy at law. Accordingly, Plaintiffs are entitled to an injunction against Virtus, pursuant to *Fla. Stat.* § 501.211(1).

44. Plaintiffs have suffered and continue to suffer losses from the unlawful actions of Virtus, and are entitled to recover all damages sustained as a result of these actions, plus attorneys fees and court costs, pursuant to *Fla. Stat.* § 501.211(2) and § 501.2105.

**WHEREFORE,** Plaintiffs request that the Court:

(a) Enter judgment in favor of Plaintiffs against Virtus;

(b) Preliminarily and permanently enjoin Virtus, its officers, members, directors, employees, partners, agents, licensees, servants, successors and assigns, and any and all persons acting in privity or concert with them, from representing that the Virtus Purported Generic Products contain the same amounts of the identical active ingredients as the Pamlab Products, and that they are generic equivalents of, substitutable for, and/or may be dispensed to fill prescriptions for the Pamlab Products;

(c)     Award Plaintiffs compensatory damages by reason of Virtus's violation of the Lanham Act, and its violation of the FDUTPA, as determined at trial;

(d)     Award Plaintiffs Virtus's profits, including an accounting thereof, as authorized by 15 U.S.C. § 1117;

(e)     Award Plaintiffs their actual costs and reasonable attorneys' fees incurred in this action, as authorized by 15 U.S.C. § 1117 and by *Fla. Stat.* § 501.2105; and

(f)     Enter an Order granting Plaintiffs such other and additional relief against Virtus as may be just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Dated: October 29, 2012

Laura Ganoza (FL Bar. No. 118532)
lganoza@foley.com
Alan R. Poppe (FL Bar No. 186872)
apoppe@foley.com
Christina M. Kennedy (FL Bar No. 58242)
ckennedy@foley.com
FOLEY & LARDNER LLP
One Biscayne Tower, Suite 1900
2 S. Biscayne Blvd.
Miami, Florida 33131
Tel. No.: 305-482-8400
Fax No.: 305-482-8600