UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:12-cv-81202-Williams/Brannon

NESTLÉ HEALTH SCIENCE – PAMLAB, INC.
and BRECKENRIDGE PHARMACEUTICAL, INC.,

    Plaintiffs,

v.

VIRTUS PHARMACEUTICALS, LLC,

    Defendant.

## PLAINTIFFS' MOTION FOR A DIRECTED VERDICT

Plaintiffs Nestlé Health Science – Pamlab, Inc. ("Nestle") and Breckenridge Pharmaceutical, Inc. ("BPI") (collectively, "Plaintiffs") respectfully move for a directed verdict as to liability on their claims for false advertising, contributory false advertising, and violations of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA") against Defendant Virtus Pharmaceuticals, LLC ("Virtus").

### INTRODUCTION

Virtus is liable for false advertising because it falsely and misleadingly advertised its products as having the same strength and purity of L-methylfolate as Plaintiffs' products, when this was simply not true, and because it advertised its products as having a two-year shelf life, when, that, too, was untrue and Virtus had no testing to support this claim, and for claiming they were generic to Plaintiffs' products when they in fact were not.  Virtus is liable for contributory false advertising because it successfully induced industry databases, including First DataBank and Medi-Span, to widely disseminate via commercial speech Virtus' false and misleading representations that Virtus' products have the same ingredient in the same amounts as Plaintiffs' products when they do not, and are "generic" versions of Plaintiffs' products, when they are not, to Plaintiffs' injury.  This same conduct establishes that Virtus violated the FUDTPA.  Because the evidence presented at trial overwhelmingly supports a finding of liability, Plaintiffs are entitled to a directed verdict.

**ARGUMENT**

A directed verdict should be granted if the evidence, viewed in the light most favorable to the non-moving party, "point[s] overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Carter v. Miami*, 870 F.2d 578, 581 (11th Cir. 1989). Where "there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions," then the case should be submitted to the jury. *Hipp v. Liberty Nat'l Life Ins.*, 252 F.3d 1208, 1230 (11th Cir. 2001). However, a "mere scintilla of evidence does not create a jury question. Motions for directed verdict and for judgment notwithstanding the verdict need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather, there must be a substantial conflict in evidence to support a jury question." *Id.*

**I.      Plaintiffs' False Advertising Claims**

The evidence Plaintiffs presented at trial shows that Virtus is liable for false advertising. Virtus falsely advertised its products as having the same strength and purity as Plaintiffs' products, and further falsely advertised its products as having a two-year shelf life without any testing to substantiate such expiration dating. Plaintiffs have also provided abundant evidence as to the harm incurred by Plaintiffs to date as a result of Virtus' false representations about its products. Virtus, however, has not presented evidence sufficient to rebut the overwhelming evidence in support of Plaintiffs' false advertising claims. Plaintiffs are therefore entitled to a directed verdict as to Virtus' liability on their false advertising claims.

**A. Applicable Law**

**1. Liability Under the Lanham Act**

Section 43(a) of the Lanham Act gives rise to a cause of action against "[a]ny person who," in connection with any goods or services, uses in commerce "any word" or "misleading description of fact" which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(b). The elements of a claim include:

1. the ads of the opposing party were false or misleading,
2. the ads deceived, or had the capacity to deceive, consumers,
3. the deception had a material effect on purchasing decisions,
4. the misrepresented product affects interstate commerce, and
5. the claimant has been, or is likely to be, injured by the false advertising.

2

*J. & J. Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A remedial statute, § 43(a) is to be broadly construed. *Montgomery v. Noga*, 168 F.3d 1282, 1300 n.29 (11th Cir. 1999).

While the Lanham act forbids both literally false and literally true but misleading advertisements, *J. & J. Vision Care*, 299 F.3d at 1247, the distinction matters. A court must assume that literally false advertisements actually mislead consumers, without requiring evidence of deception. *Id.* When determining whether a representation is literally false or misleading, "a court must analyze the message conveyed in full context" and "view the face of the statement in its entirety." *Id.* at 1248. "Statements that have an unambiguous meaning, either facially or considered in context, may be classified as literally false." *Osmose, Inc. v. Viance, L.LC.,* 612 F.3d 1298, 1309 (11th Cir. 2010). If the Court agrees that all of Virtus' claims are completely unsubstantiated, they are presumptively and literally false. *Novartis,* 290 F.3d at 589-90 ("[A] court may find that a completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff to that effect."); *GlaxoSmithKline v. Merix Pharma. Corp.*, No. 05-898 (DRD), 2005 U.S. Dist. LEXIS 30198, at *22 (D.N.J. Sept. 13, 2005) ("Where, as in the present case, a claim is completely unsubstantiated a plaintiff need not offer affirmative evidence in support of its contention that a challenged claim is false.").

Prescription product labeling is advertising under the Lanham Act because it "may influence a consumer in his or her choice to purchase a product." *Sirius Labs, Inc. v. Rising Pharm., Inc.*, No. 03 C 6965, 2004 WL 51240, at *4 (N.D. Ill. Jan. 7, 2004); *see also Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 937-38 (8th Cir. 2005); *Novartis Consumer Health v. Johnson & Johnson*, 290 F.3d 578, 590 (3d Cir. 2002); *Healthpoint, Ltd. v. Ethex Corp.,* 273 F. Supp. 2d 817, 846 n.141 (W.D. Tex. 2001).

Falsely labeling a product as containing more of an ingredient than it actually has is a classic example of false advertising. *See, e.g., Cashmere & Camel Hair Mfrs. V. Saks Fifth Ave.,* 284 F.3d 302, 312 (1st Cir. 2002). In *Cashmere*, a manufacturer labeled its garments as containing "10% cashmere," when in fact there were no discernible cashmere fibers in the coats. *Id.* at 306-07. Affirming the district court's presumption of materiality, the First Circuit held:

> it seems obvious that cashmere is a basic ingredient of a cashmere-blend garment; without it, the product could not be deemed a cashmere-blend garment or compete in the cashmere-blend market. Thus, it seems reasonable to conclude that

3

defendants' misrepresentation of the blazers' cashmere content is material because it relates to a characteristic that defines the product at issue, as well as the market in which it is sold.

*Id.* at 312.

The deceptive impact of misstating the content of a product is only heightened in the generic prescription market, because had Virtus labeled its products truthfully, they would never have been linked to or substituted for Nestlé's. *See, e.g, Midlothian Labs., L.L.C. v. Pamlab, L.L.C.,* 509 F. Supp. 2d 1065, 1075 (M.D. Ala. 2007) (different amounts of active ingredients in prescription products "prevents the two products from being interchangeable at pharmacies").

### 2. Virtus' Advertising Makes Unsupported Establishment Claims

Virtus' representations regarding its products – that they have the labeled amount of L-methylfolate, that they do not contain more than 1% D-methylfolate, that they will maintain their strength for at least two years, and that they are "generic" – that is, they have the same ingredient in the same strength as Plaintiffs' products – are each "establishment" claims.

The Eleventh Circuit has recognized that a "plaintiff challenging 'tests prove' or 'establishment' claims" such as Virtus' "does not have to affirmatively prove that" the claims are false. *Osmose*, 612 F.3d at 1310. Rather, "[i]n order to prove the literal falsity of such [an establishment] claim, the plaintiff must prove only that the tests did not establish the proposition for which they were cited." *Id*. at 1309. As other courts have recognized, "establishment claims may be asserted by implication[.]" *Euro-Pro Op. LLC v. Euroflex Ams.,* No. 08CV6231(HB), 2008 WL 5137060, at *7 (S.D.N.Y. Dec. 8, 2008). Noting, as did the court in *Osmose,* that "advertising claims must be evaluated in context," the *Euro-Pro* court explained:

> a plaintiff whose adversary relies upon scientific testing through innuendo must be allowed to establish the falsity of the challenged claims by showing the tests implicitly relied upon are unreliable, just as it would be permitted to do had the establishment claims been made expressly.

*Id.*; *see also S.C. Johnson & Sons, Inc. v. Clorox Co.*, 930 F. Supp. 753, 780 (E.D.N.Y. 1996) (noting "the test-proven message is communicated implicitly, yet powerfully, by the presence of a scientist in a laboratory coat who makes each of the challenged claims in the Commercial").

Virtus' argument that Plaintiffs have not stated an establishment claim because Virtus' advertising do not expressly state "tests show" ignores the cardinal rule in false advertising cases: context matters, and advertising claims must be evaluated in context. "When determining

4

whether an advertisement is literally false or misleading, courts must analyze the message conveyed in *full context*, and must view the face of the statement *in its entirety*." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010) (emphasis added) (citing *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586-87 (3d Cir. 2002) ("A 'literally false' message may be either explicit or 'conveyed by necessary implication' when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.").

The Eleventh Circuit has never "rejected" an implied establishment claim. Rather, in adopting the framework for analyzing establishment claims crafted by other circuits, the Eleventh Circuit used language that was relevant to the case at hand. *See J&J v. 1-800 Contacts,* 299 F.3d at 1248 ("As the common law of false advertising has developed, several circuits have determined that the nature of plaintiff's burden in proving an advertisement to be literally false should depend on whether the defendant's advertisement cites consumer testing.") (citing *C.B. Fleet Co. v. SmithKline Beechum Consumer Healthcare L.P.*, 131 F.3d 430, 435 (4th Cir. 1997); *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 514-15 (8th Cir. 1996); *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992)). But as the Eleventh Circuit noted in *Osmose*, those favorably cited out-of-circuit cases recognized both express and implied establishment claims. *See Osmose*, 612 F.3d 1309 n.6 (citing *C.B. Fleet*, 131 F.3d at 435 (stating the standard as including "expressly or impliedly" asserted favorable facts); and *Quaker State*, 977 F.2d at 63 ("defendant's ad explicitly or implicitly represent[ing] that tests or studies prove" its product's superiority)).

It is undisputed that Virtus never tested its products to determine whether they did or did not have more than 1% D-methylfolate, and it never tested their stability to have a basis for the asserted shelf-life. As a matter of law, Virtus is liable for false advertising with respect to these issues. Nor does Virtus dispute that it ever tested the potency of its "Versions 0 and 1" products manufactured by GeoPharma; Virtus' potency claims with respect to these products are wholly unsubstantiated and literally false. Because the products do not have the same the same ingredients in the same strengths, they cannot be "generic," and that claim is also literally false.

Moreover, the evidence established in this case proves that Virtus is liable for false advertising, regardless of whether or not the claims are deemed to be establishment claims.

5

### B. Evidence Presented in This Case
#### 1. Virtus falsely advertised its products' strength.

Virtus' labeling for each version of each of its products contained a false statement of each product's strength. It remains undisputed that Plaintiffs' testing showed that Versions 0 and 1 of Virtus' products failed to meet label claims. *See* Pl.'s Exs. 6, 12, 14, 16, 21-26, 129 (failing test results for Virtus' products); *see also* Trial Tr. 8/19 A.M. 67-79 (Herbel); Trial Tr. 8/19 P.M. 8-10 (Scotten) (regarding failing test results). Furthermore, Virtus' own testing, and third-party testing, prove that Versions 2 and 3 also failed to meet label claims. *See* Trial Tr. 8/18 P.M. 9-12 (Akand) (regarding NHK's own testing of Virtus' products with failing results); *see also* Pl.'s Ex. 1A (failing test results of third-party, ABC Labs). Based on the overwhelming evidence cited herein, Virtus' label claims as to the strength of its products are literally false.

Moreover, the evidence also establishes that Virtus did not substantiate its label claims regarding its products' strength. George Stuart, the President of GeoPharma a/k/a Innovative, Virtus' initial manufacturer, testified by video-deposition that GeoPharma conducted no raw material testing or finished product testing for the entire first year that Virtus' four products were on the market. Tr. Transcript (Aug. 13, 2013) at 118-123. Even when Virtus switched manufacturers to NHK, NHK failed to conduct proper tests. Shabbir Akand of NHK testified that NHK merely "attempted" to test the products. Trial Tr. 8/18 P.M. 90-91. Moreover, the testing conducted by NHK's own chemists revealed that the results were legitimately low and internal NHK personnel were concerned about the stability of the product. All of this evidence, none of which has been refuted by Virtus, weighs in favor of granting Plaintiffs a directed verdict as to Virtus' liability for false advertising.

#### 2. Virtus falsely advertised its products' purity.

Additionally, Virtus' labeling for each version of each of its products also falsely indicated that each had the same purity as the Plaintiffs' products. Plaintiff's testing showed that none of the versions of Virtus' products performed to label claims of purity. *See* Pl.'s Exs. 6, 12, 14, 16, 129 (failing D-methylfolate test results for Virtus' products). Specifically, Mitchell Herbel, Plaintiffs' expert witness, testified that the results of Virtus product testing for D-methylfolate content returned failing results. *See* Trial Tr. 8/19 A.M. 67-79 (Herbel). Notably, Plaintiffs' testing is the only testing that was ever done to determine the purity of Virtus'

products. As is the case with Virtus' label claims regarding its products' strength, Virtus also lacks any evidence substantiating label claims of its products' purity. NHK, Virtus' manufacturer, never tested Virtus' products for D-methylfolate content, and only merely "attempted" to test Virtus' products in general. *See* Trial Tr. 8/18 P.M. 90-91, 93.

Although Virtus itself did no testing of the strength or purity of its products, during trial, Virtus offered the testimony of Dr. Thomas Bannister. Dr. Bannister stated, in his expert opinion, that as long as a product is at least ninety percent "L," thereby making "L" a major product component, that product can properly be called "L-methylfolate." **[Transcript of testimony of Dr. Bannister not yet available].** However, Virtus' product labels do not indicate that each product is "ninety percent L-methylfolate," or that each product contains "less than ten percent" of ingredients that are not L-methylfolate. Instead, Virtus' product labels make the much more specific claim that each contains "less than one percent D-methylfolate." *See* Virtus products' bottles and labels, Pl.'s Exs. 275, 276, 279, 311.

### 3. Virtus falsely advertised its products' shelf life.

Finally, all versions of Virtus' products contained a label claim that each had a shelf life of two years. A shelf-life representation means that the product will retain its labeled strength at least through the expiration date. The evidence here shows that Virtus' products were tested as *below* their labeled strength within the expiration period. This testing occurred within a span of several months after manufacture, much less than two years. Accordingly, the evidence of testing in the record indicates that each version of Virtus' products failed to live up to a two-year shelf life label claim. Virtus did not and could refute any of this evidence with its own, because it never conducted stability testing of its products.

The evidence simultaneously shows that while Virtus lacked any data substantiating its products' shelf life claims, pharmacists perceived Virtus' advertising messages regarding its products' shelf life as representations that Virtus had tested each product to support each claim. *See* Trial Tr. 8/20 87 (Poret). Hal Poret, Plaintiff's expert, testified during trial that based on data from a survey of pharmacists that he conducted, pharmacists interpret Virtus' shelf life advertisements as a representation that Virtus has testing to substantiate each shelf life claim. *Id.* Mr. Poret further testified that if pharmacists knew that an expiration date on a product was not supported by testing, that fact alone would make them less likely to dispense that product to patients. *Id.* Dr. Robert S. Litman, Virtus' pharmacy expert, similarly testified that he would

7

Case 9:12-cv-81202-KMW   Document 347   Entered on FLSD Docket 08/22/2014   Page 8 of 14

expect Virtus to have stability data on the products they were selling. **[Transcript of testimony of Dr. Litman not yet available].** Based on the foregoing, Virtus is necessarily liable for false advertising for any label claims it made as to the shelf life of any of its products.[1]

Furthermore, while Virtus was under no *regulatory* obligation to advertise its products with an expiration date, as a practical reality, it *had* to have an expiration date to sell any products. Louis Sanchez testified during trial that if no expiration date was included on Virtus' product labels, Virtus' customers would not have bought their products. *See* Trial Tr. 8/14 A.M. 24:24-26: 5 (Sanchez). Where "a manufacturer does advertise an expiration date, the FDA states that the 'expiration date should be supported by data.'" *Pamlab, LLC v. Macoven Pharms., LLC*, 881 F. Supp. 2d 470, 478 (S.D.N.Y. 2012) (citing *Labeling Practice*, 72 Fed. Reg. 34752, 34856 (June 25, 2007)); *see also* 21 C.F.R. § 111.75(c)(2) ("You **must** conduct appropriate tests or examinations to determine compliance with the specifications selected in paragraph (c)(1) of this section" [regarding "identity, purity, strength, composition, and the limits on those types of contamination that may adulterate or that may lead to adulteration of the dietary supplement"]).

As the Court aptly noted, such label claims seem to presuppose, or imply, that Virtus' products underwent some testing that would allow Virtus to substantiate its label claims regarding each product's purity, strength, and shelf life. Plaintiffs' test results indisputably show that Virtus' products contain four to seven times more D-methylfolate than the label claim of less than one percent. *See* Trial Tr. 8/19 A.M. 67-79 (Herbel). Virtus' own testing, and third-party testing, also provide routinely failing results for Virtus' products. *See* Trial Tr. 8/18 P.M. 9-12

---

[1] "The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived." *U-Haul Int'l v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986); *see also, e.g.*, *Cashmere & Camel Hair Manufacturers Inst. V. Saks Fifth Ave.*, 284 F.3d 302, 317 (1st Cir. 2002) (stating that this presumption applies regardless of whether a plaintiff's claims involve implied or literal falsity); *Resource Developers, Inc. v. The Statute of Liberty-Ellis Island Foundation, Inc.*, 926 F.2d 134, 140 (2d Cir. 1991) (stating that it is fair to apply this presumption to "any situation where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public."); *Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683, 694 (6th Cir. 2000) (acknowledging the applicability of this presumption in cases where literal falsity is accompanied by deliberate intent or bad faith); *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1133-34 (8th Cir. 1997) (citing various cases in other circuits approving of this "presumption of deception"); *JTH Tax, Inc. v. H&R Block Eastern Tax Servs.*, 128 F. Supp. 2d 926, 938 (E.D. Va. 2001) (finding that where the defendants' literally false newspaper advertisements required no evidence of actual deception before the court could grant relief); *Riggs Inv. Mgmt. Corp.. v. Columbia Partners, LLC,* 965 F. Supp. 1250, 1269 n.12 (D.D.C. 1997) (concluding that where defendants understood that certain promotional materials were improper, yet still continued to distribute them, even after the lawsuit was filed, entitled plaintiffs to the presumption of consumer deception).

8
4835-6514-7677.1

(Akand) (regarding NHK's own testing of Virtus' products with failing results); *see also* Pl.'s Ex. 1A (failing test results of third-party, ABC Labs).

When taken in context, Virtus' false statements as to its products' strength, purity, and shelf life all constitute establishment claims. As such, Plaintiffs' overwhelming proof that Virtus product label claims were neither substantiated at the time they were made, and that subsequent testing of Virtus' products proved the falsity of these claims, entitle Plaintiffs to a directed verdict on their false advertising claims. Even if the Court decides that Virtus' false label claims are not, indeed, establishment claims, the evidence in the record nevertheless weighs heavily in favor of granting a directed verdict to Plaintiffs on Virtus' liability for false advertising.

### 4. Plaintiffs have been, and will be, harmed by Virtus' false advertising.

Finally, the unrebutted evidence in the record readily establishes that Plaintiffs have already been, and will continue to be, harmed by Virtus' acts of false advertising. Larry Lapila, Breckenridge's Executive Vice President, testified to this fact during trial. *See* Trial Tr. 8/15 A.M. 44 (Lapila). Julie Hayden, the Senior Vice President of Nestlé, testified to the fact that both Nestlé and Breckenridge were harmed by Virtus' false advertising, as well as to what degree and in what amounts. *See* Trial Tr. 8/20 28:20-39:4 (Hayden). Virtus failed entirely to provide any testimony or other evidence to the contrary, which further underscores Plaintiffs' entitlement to a directed verdict.

Furthermore, based on applicable case law, Plaintiffs are also entitled to a presumption of causation and harm on their false advertising claims. In *Trilink Saw Chaiun LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1321 (N.D. Ga. 2008), the court applied "a presumption of causation and harm...[to]...claims for actual damages when a defendant disseminates willfully deceptive, comparative advertising." As the court explained, this "presumption forces the willful fabricator—rather than its intended victim—to bear the burden of demonstrating that its deliberate misrepresentations did not result in harm to its competitor. Thus, it discourages companies from engaging in deliberately deceptive advertising campaigns, protecting consumers and competitors alike." *Id.* Based on the evidence discussed above, Virtus clearly engaged in the kind of "willfully deceptive, comparative advertising" that entitles Plaintiffs to a presumption of causation and harm in this context. However, Virtus has not provided any evidence indicating that its "deliberate misrepresentations did not result in harm to" Nestlé and Breckenridge. The evidence thus proves that Plaintiffs have been, and continue to be, harmed by Virtus' false

9

advertising.  Based on the foregoing, it would be proper to grant Plaintiffs a directed verdict on their false advertising claims.

## II. Virtus Is Liable For Contributory False Advertising Under *Inwood Labs*.

Virtus can and should be held vicariously liable for inducing a Lanham Act violation. *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853-54 (1982):

> [L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another.  Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit.

*Id.* at 853-54; *see also Mini Maid Servs. Co. v. Maid Brigade Sys.,* 967 F.2d 1516, 1521-22 (11th Cir. 1992) (construing *Inwood* and holding that franchiser could be held liable for franchisee's infringement when it intentionally induced trademark violations or knowingly participated in the franchisee's infringement); *Societe Des Hotels v. Lasalle Hotel Operating,* 380 F.3d 126, 133 (2d Cir. 2004) (construing *Inwood* and reversing dismissal of contributory false advertising claim).

Plaintiffs' claim here is essentially identical to Merck's successful claim for contributory false advertising against Brookstone (a/k/a, "Acella") Pharmaceuticals. *See Merck Eprova AG v. Brookstone Pharmaceuticals, LLC*, 920 F. Supp. 2d 404 (S.D.N.Y. 2013).  Acella, just like Virtus, had falsely advertised its "generic" folate products as containing "L-methylfolate," purportedly equivalent to Merck's Metafolin.  And just as Virtus' false advertising did here, Acella's "false labeling prompted pharmaceutical databases to 'link' the cheaper Acella products to the more expensive Merck product, inducing pharmacies and others to believe that Acella's folate could be substituted for Merck's despite their different chemical compositions." *Id.* at 410 (describing allegations); *id*. at 415 (findings).  After addressing Acella's liability for its own false advertising, the court also found Acella liable for contributory false advertising. *Id.* at 425.

The *Merck v. Brookstone* court first noted that "in order to prove that Acella engaged in contributory false advertising in violation of the Lanham Act, Merck must establish false advertising by the databases." *Id.*  This element was easily met; "[t]he evidence at trial clearly demonstrated that Acella led the databases to make misleading claims regarding Xolafin and

Xolafin–B's chemical composition." *Id.* Just as in the instant case,

> it has been well-established that Acella's intentionally misleading labels caused the databases to link as chemically equivalent Acella and Metafolin-containing products, a falsehood, and that this linkage caused the marketplace to treat the products as similar or, in some states, commanded their substitution. Further, Acella's success in persuading at least two of the major pharmaceutical databases to link its products with Merck products shows a significant penetration of the market.

*Id.* Based on these facts—identical to those in this case—the court found "that Acella intentionally induced the databases to falsely advertise and that Merck has prevailed on its contributory false advertising claim." *Id.*; *see also Merck Eprova AG v. Gnosis S.P.A.*, 901 F. sup. 2d 436, 456-57 (S.D.N.Y. 2012) ("Gnosis is liable to Merck for contributory false advertising" in case involving products falsely advertised as containing L-methylfolate "because its false use of the common name caused its distributors to also falsely advertise."), *aff'd*, *Merck Eprova AG v. Gnosis S.p.A.,* 2014 WL 3715078 (2d Cir. Jul. 29, 2014).

Here, Virtus communicated with the databases, asked that its products be linked to Plaintiffs, and succeeded in obtaining that linkage. The "product" the databases sell is information. Trial Tr. (Aug. 13, 2014) at 52-53 ("The databases publish information. So it is not public information, but people who want to buy a subscription to the databases will have access to their information."). The information disseminated by the databases influences customers and drives sales of Virtus' products:

> Q. What happens because of that linkage.
> [sustained objection to response]
> Q. Does it result in the Virtus Product being substituted?
> A. Yes.
> Q. What does that mean in terms of what product the patient gets?
> A. It will be based off what the pharmacist chooses to give the patient. If it is a linked product, pharmacists can choose to provide the brand or the generic, which in the database, says they are identical. And the pharmacy can offer that choice to the patient, or choose themselves in some states.

Trial Tr. (Aug. 13, 2014) at 59-60. Because Virtus successfully induced the databases to falsely advertise Virtus' products as generic to Plaintiffs', and as having the same strengths of the same ingredient as Plaintiffs, Virtus is liable for contributory false advertising. Plaintiffs are therefore entitled to a directed verdict as to this claim.

11

4835-6514-7677.1

### III.  FUDTPA

"Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful under FUDTPA.  Fla. Stat. § 501.204(1).  The elements of a FUDTPA claim include: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.  *See Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.,* 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007).  A deceptive practice is one that is likely to mislead consumers, and an unfair practice is one that "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* (citation omitted).  A "party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue."  *Id*. (quotations omitted).  Generally, FUDTPA claims are governed by the same standards as § 43(a) of the Lanham Act.  *E.g., Suntree Techs., Inc. v. Ecosense Int'l, Inc.,* 802 F. Supp. 2d 1273, 1279 (M.D. Fla. 2011).  For all of the same reasons discussed in Section I, Plaintiffs should be granted a directed verdict on their FUDTPA claims against Virtus.

### CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court enter an Order granting a directed verdict in Plaintiffs' favor on their claims against Virtus for false advertising, contributory false advertising, and FUDTPA.

Dated: August 22, 2014

Respectfully submitted,

By:  *s/Christina M. Kennedy*
**Laura Ganoza**
Florida Bar No. 118532
lganoza@foley.com
**Christina M. Kennedy**
Florida Bar No. 58242
ckennedy@foley.com
**FOLEY & LARDNER LLP**
2 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone (305) 482-8400

**Saul H. Perloff (***Pro Hac Vice***)**
saul.perloff@nortonrosefulbright.com
**Katharyn A. Grant (***Pro Hac Vice***)**

12

        katharyn.grant@nortonrosefulbright.com
        **Joseph A. Bourbois** (*Pro Hac Vice*)
        joseph.bourbois@nortonrosefulbright.com
        **Fulbright & Jaworski LLP**
        300 Convent Street, Suite 2100
        San Antonio, Texas 78205
        Telephone (210) 224-5575

        **Robert F. Vroom (***Pro Hac Vice***)**
        rvroom@bpirx.com
        **Breckenridge Pharmaceutical, Inc.**
        60 E. 42nd Street, Suite 5210
        New York, New York 10165
        Telephone (646) 448-1309

        **Robert L. Rouder (***Pro Hac Vice***)**
        robert.rouder@nortonrosefulbright.com
        **Fulbright & Jaworski LLP**
        98 San Jacinto Boulevard Ste 1100
        Austin, Texas 78701-4255
        Telephone  (512) 474-5201

*Attorneys for Plaintiffs*
**Nestlé Health Science – Pamlab, Inc.**
**and Breckenridge Pharmaceutical, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 22, 2014, a copy of the foregoing was served via the CM/ECF service and United States mail upon the following:

Stephen J. Wein, Esq.
Joseph P. Kenney, Esq.
Weber, Crabb & Wein, P.A.
5999 Central Avenue, Suite 203
St. Petersburg, FL 33710
steve.wein@webercrabb.com
joseph.kenny@webercrabb.com

Christopher Paradies, Esq.
Paradies Law, P.A.
4914 Joanne Kearney Blvd.
Tampa, Florida 33619
cparadies@paradieslaw.com

Brett B. Bartel
W. Scott Creasman
Taylor, English, Duma, LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
bbartel@taylorenglish.com
screasman@taylorenglish.com

Janet T. Munn
Rasco Klock Perez Nieto
283 Catalonia Avenue, Suite 200
Coral Gables, FL 33134
jmunn@rascoklock.com

Christopher T. Jagoe
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
christopher.jagoe@kirkland.com

Oliver C. Bennett
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
oliver.bennett@kirkland.com

Stephen J. Elkind
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
stephen.elkind@kirkland.com

Jordan M. Heinz
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
jordan.heinz@kirkland.com

Megan M. New
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
megan.new@kirkland.com

*Counsel for Virtus Pharmaceuticals, LLC*

By: s/ *Christina M. Kennedy*
Attorney for Plaintiff